UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
IN THE MATTER OF THE COMPLAINT OF SEA
WOLF MARINE TOWING AND TRANSPORTATION,
INC., AS OWNER OF THE TUG SEA WOLF FOR     03 cv 5578 (KMW)(THK)
EXONERATION FROM OR LIMITATION OF                OPINION AND ORDER
LIABILITY
-------------------------------------x
KIMBA M. WOOD, U.S.D.J.:

Petitioner Sea Wolf Marine Towing and Transportation, Inc. ("Sea Wolf Marine") moves for partial summary judgment pursuant to the Limitation of Vessel Owner's Liability Act (the "Act"), 46 App. U.S.C. §§ 181-189.[1] Claimant National Railroad Passenger Corporation ("Amtrak") opposes the motion. For the reasons stated below, Sea Wolf Marine's motion is GRANTED.

I.  **Background**

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Civil Rule 56.1 statements[2] and deposition testimony.[3] All inferences have been

---

[1] The Act was recodified effective October 6, 2006 at 46 U.S.C. §§ 30501-30512.

[2] Amtrak's 56.1 Stmt. extensively relied upon an United States Coast Guard Investigative Report. On May 25, 2007, pursuant to Fed. R. Civ. P. Rule 56(e), Local Civil Rule 56.1(d), and 46 U.S.C. § 6308, the Court granted Sea Wolf Marine's request that all references to this United States Coast Guard Investigative Report be struck in Amtrak's 56.1 Stmt. Therefore, several of the assertions in Amtrak's 56.1 Stmt. are no longer supported by "a citation to evidence which would be admissible." Local Civil Rule 56.1(d). The Court "is free to disregard" such assertions. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73-74 (2d Cir. 2001)(citations and internal quotations omitted).

[3] Deposition testimony is referred to as "[X] Dep. [X]."

1

drawn in favor of Amtrak.

Sea Wolf Marine is the owner of the Tug Sea Wolf ("Tug"). Sea Wolf Marine's 56.1 Stmt. ¶ 3. Captain William Wittich is the owner and president of Sea Wolf Marine. Id. ¶¶ 1-2. The Tug is an uninspected towing vessel of 99 gross register tons and 67 net register tons. Id. ¶ 4. At the time of the incident, the Tug was manned by a three person crew: David Sprague serving as the Tug's master, Mark Oravets serving as the Tug's mate, and Joseph Oltmann serving as the Tug's engineer. Id. ¶¶ 8, 9, 25, 32.

Amtrak is the owner of the Spuyten Duyvil Bridge (the "Bridge"). Sea Wolf Marine's Mem. 7. The Bridge spans the Spuyten Duyvil Creek. Sea Wolf Marine's 56.1 Stmt. ¶ 70.[4]

On the night of February 6, 2003, Captain Wittich assigned the Tug to transport an empty stone barge (the "Barge") from Greenville Stake, in New York harbor, to Haverstraw, New York. Sea Wolf Marine's 56.1 Stmt. ¶¶ 40-41. To complete this assignment, the Tug and Barge did not have to navigate under the Bridge or on the Spuyten Duyvil Creek. Id. ¶¶ 68-69. The Tug and Barge, however, veered off course. Id. ¶ 72. The Barge then collided with the Bridge, damaging the Bridge's fender and superstructure. Id. ¶ 84.

---

[4] It is undisputed that the Bridge lies across the Spuyten Duyvil Creek off of the Hudson River, but Amtrak notes that the fenders of the Bridge extend into the Hudson River. Amtrak's 56.1 Stmt. ¶ 70.

2

**II. DISCUSSION**

    **A. Summary Judgment Standard**

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007). The substantive law governing a case will determine which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).

The burden of demonstrating the absence of any genuine issue of material fact rests with the moving party. See Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002)(citing Celotex Corp., 477 U.S. at 323). Once a motion for summary judgment is made and supported, "the non-moving party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Fed. R. Civ. P. 56(e)). All inferences must be drawn in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255.

**B. Legal Standard for Limitation Actions**

Sea Wolf Marine brings this action pursuant to the Limitation of Vessel Owner's Liability Act. 46 App. U.S.C. §§ 181-189. The Act "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 446 (2001) (citing 46 App. U.S.C. § 183(a)). Privity "means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury." Coryell v. Phipps, 317 U.S. 406, 411 (1943)(citations omitted).

In an action for limitation of liability, the Court must consider (1) if the vessel was unseaworthy or if the accident was caused by negligence, and (2) if the shipowner had knowledge or privity of the unseaworthiness or negligence. In re Guglielmo, 897 F.2d 58, 61 (2d Cir. 1990)(citations omitted). The claimant, Amtrak, must establish unseaworthiness or negligence. Then, the petitioner, Sea Wolf Marine, must prove lack of knowledge or privity of that unseaworthiness or negligence. Id.

Sea Wolf Marine argues that it is entitled to summary judgment because there is no genuine issue as to (1) the Tug's seaworthiness, or (2) Sea Wolf Marine's lack of knowledge or privity of the captain's negligence. In response, Amtrak argues summary judgment should be denied because it can establish (1)

4

unseaworthiness, (2) negligence, and (3) Sea Wolf Marine's knowledge or privity.

Reviewing the evidence in the light most favorable to Amtrak, the Court finds that no genuine issues of material fact exist for trial, and that Sea Wolf Marine is entitled to summary judgment.

**1. Seaworthiness**

Although seaworthiness is a relative term, "[t]he general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1155 (2d Cir. 1978)(citations omitted). Amtrak argues (1) the Tug was unseaworthy because Captain Sprague was "incompetent," and (2) there is a genuine issue for trial regarding the Tug's mechanical seaworthiness. These arguments lack merit.

**a. Captain Sprague's "Incompetence"**

Competence of a ship's crew "depends upon several factors, including" (1) "whether the captain, pilot, and navigator are licensed;" (2) "whether they have satisfactory safety records;" (3) "whether they are familiar with the vessel and the waters on which it travels;" and (4) "whether they are adequately trained." Illinois Constructors Corp. v. Logan Transp., 715 F.Supp. 872, 886 (N.D.Ill. 1989). Considering these factors, the Court cannot

5

find Captain Sprague "incompetent."

First, it is undisputed that Captain Sprague held the required license at the time of the collision. Amtrak's Mem. 17. Second, Captain Sprague maintained a satisfactory safety record. It is undisputed that he obtained a 100 ton master's license and a master of towing vessels license from the United States Coast Guard in 1978. Sea Wolf Marine's 56.1 Stmt. ¶ 13. From 1978 until the 2003 collision, Captain Sprague was involved in only two other accidents. Sprague Dep. 102-06. Third, Captain Sprague was familiar with the Tug. He had been employed as a captain by Sea Wolf Marine since 1999. Id. 12-13. It is undisputed that since that time, he had been "the master typically assigned" to the Tug. Sea Wolf Marine's 56.1 Stmt. ¶ 11. Fourth, Captain Sprague was adequately trained. It is undisputed that he was "instructed to operate in a safe manner in conditions of poor visibility." Amtrak's Mem. 17. It is also undisputed that in February 2003, Captain Sprague's master's license, radar endorsement, and towing endorsement were current. Sea Wolf Marine's 56.1 Stmt. ¶ 22. Both the master's license and radar endorsement had to be renewed every five years. Id. ¶ 18. It is undisputed that Sea Wolf Marine provided training for the renewal examination for the radar endorsement Id. ¶¶ 20-21.

Amtrak points to Captain Sprague's failure to post a lookout as evidence of his "incompetence." Amtrak's Mem. 17. Given his

license, safety record, and experience, however, the Court does not find Captain Sprague "incompetent." See, e.g., In re Am. Milling Co., 409 F.3d 1005, 1017 (8th Cir. 2005)(refusing to find a vessel's captain incompetent based on his experience, safety record, and actions before and after an accident); In re Kristie Leigh Enterprises, Inc., 72 F.3d 479, 482 (5th Cir. 1996)(refusing to find a vessel's captain incompetent based on his license, experience, and safety record).[5] The evidence in the record simply cannot support a finding of unseaworthiness based on Captain Sprague's alleged "incompetence."

### b.   Mechanical Seaworthiness

There is no genuine issue for trial regarding the Tug's mechanical seaworthiness. It is undisputed that the Tug underwent daily inspections by the crew, two or three inspections per week by a port engineer, and biweekly inspections of the bottom by a diver. Sea Wolf Marine's 56.1 Stmt. ¶¶ 101-03.[6] It is also undisputed that at the time of the collision, the Tug

---

[5] Compare In re Guglielmo, 897 F.2d at 61 (reasoning that a trier of fact could find incompetent the non-professional operator of a power boat because he had been "drinking beer" prior to the accident and violated an "elementary and essential safety precaution" in "looking back at the waterskier" rather than looking in the direction in which the power boat was moving).

[6] Amtrak argues that Sea Wolf Marine lacked "policies and/or rules" regarding the inspection of vessels and related record-keeping. Amtrak's 56.1 Stmt. ¶¶ 101-03. Amtrak fails to cite evidence that supports this assertion. Assuming arguendo that this assertion was supported, the lack of established "policies and/or rules" does not controvert Captain Wittich's deposition testimony that these inspections occurred on a regular basis.

7

"was in good condition, the push cables were in good condition, the safety lines were in good condition, the radar worked, the Tug was maintained regularly, and the Tug was fully manned with an experienced crew."  Id. ¶ 100.[7]  Amtrak fails to set forth a genuine issue for trial regarding the Tug's mechanical seaworthiness.

### 2. Knowledge or Privity

There is no genuine issue for trial regarding the Tug's seaworthiness.  But for purposes of deciding this motion for partial summary judgment, the Court assumes arguendo that Amtrak establishes the negligence alleged.  Therefore, in order to limit its liability, Sea Wolf Marine must prove that it lacked knowledge or privity of that negligence.  Sea Wolf Marine establishes such a lack of knowledge or privity.

Privity and knowledge "have been construed to mean that a shipowner knew or should have known that a certain condition existed."  In the Matter of the Complaint of Potomac Transp., Inc., 909 F.2d 42, 46 (2d Cir. 1990)(citation and internal quotations omitted).  In the context "of a corporate shipowner, privity and knowledge may include privity and knowledge by a

---

[7] Amtrak asserts that the Tug was not well equipped for its intended voyage, but this claim is not responsive.  Furthermore, to support its assertion, Amtrak (1) cites inadmissible evidence regarding the Tug's navigational charts, and (2) recycles its allegation of Captain Sprague's "incompetence" as demonstrated by his failure to post a lookout.  Amtrak's 56.1 Stmt. ¶ 100.

8

managing agent, officer, or supervising employee of a ship." Id. (citing In re Hercules Carriers, Inc., 566 F.Supp. 962, 977 (M.D.Fla. 1983), aff'd, 768 F.2d 1558 (11th Cir. 1985)). Where the owner of a vessel has selected a competent captain, that captain's navigational errors or negligence are not within the knowledge or privity of the owner. See Kristie Leigh Enterprises, 72 F.3d at 481-82 (citations and internal quotations omitted); Hellenic Lines, Ltd. v. Prudential Lines, Inc., 813 F.2d 634, 638 (4th Cir. 1987).[8] As discussed above, Sea Wolf Marine provided a competent captain. Therefore, Captain Sprague's negligence does not fall within Sea Wolf Marine's knowledge or privity.

Amtrak attempts to set forth genuine issues for trial regarding Sea Wolf Marine's knowledge or privity of Captain Sprague's negligence. These arguments lack merit.

First, Amtrak contends that Sea Wolf Marine failed to "promulgate any policies, rules and/or procedures" regarding

---

[8] The cases cited that do find knowledge or privity on the part of a shipowner are easily distinguishable. In these cases, shipowners knew or should have known of certain conditions such as (1) the inadequate training of the captain (Lockheed Martin Corp. v. Unknown Respondents, 2007 U.S. Dist. LEXIS 23663, at *30-31 (N.D.N.Y. Mar. 29, 2007)), (2) the failure to designate a captain (Tug Ocean Prince, 584 F.2d at 1158), and (3) the failure to properly staff a vessel (Potomac Transp., 909 F.2d at 46). First, as discussed above, Captain Sprague was adequately trained. Second, it is undisputed that Captain Sprague was designated as the Tug's captain on February 6-7, 2003. Sea Wolf Marine's 56.1 Stmt. ¶ 9. Third, it is also undisputed that the Tug was typically operated by a three person crew and that at the time of the collision, the crew consisted of David Sprague, Mark Oravets, and David Oltmann. Id. ¶¶ 7-8.

9

weather conditions, poor visibility, and adherence to the lookout rule.[9] Amtrak's Mem. 18. Sea Wolf Marine did not establish written protocol regarding weather conditions or poor visibility. But both Captain Wittich and Captain Sprague understood that, after consultation with Captain Wittich, final authority to refuse a tow or cancel a tow that was already underway rested with Captain Sprague. Wittich Dep. 54-55; Sprague Dep. 22-23, 93. Furthermore, it is undisputed that in obtaining his master's license, Captain Sprague was "instructed to operate in a safe manner during conditions of poor visibility." Sea Wolf Marine's 56.1 Stmt. ¶ 15.

The absence of written protocol to implement the already mandatory lookout rule does not constitute knowledge or privity. In re MO Barge Lines, Inc., 360 F.3d 885, 891 (8th Cir. 2004)(finding no privity or knowledge where the owner "failed to explicitly advise" the operator "that he was required to follow" the inland navigational rules). Furthermore, it is undisputed that Captain Sprague was aware of and understood the lookout

---

[9]The lookout rule requires that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005 (2007). "The lookout rule applies, of course, to tugboats." Tug Ocean Prince, 584 F.2d at 1159 (citation omitted).

rule. Sprague Dep. 90.[10]

Second, Amtrak argues that Sea Wolf Marine improperly delegated to Captain Sprague the authority to decide when a lookout would be required. Amtrak's Mem. 19. Drawing on the shipowner's duty to provide a competent captain and crew, at least one court has held that a vessel's owner cannot "delegate to the master the duty to decide when a lookout would be required." In re Tug Ocean Queen, Inc., 398 F.Supp. 1062, 1070 (S.D.N.Y. 1974). This Court, however, agrees that, "[s]o long as an owner entrusts this decision to a competent crew, the determination whether to post a lookout is best left to the sound discretion of the pilot, who is aware of the on-the-scene conditions." Illinois Constructors Corp.,715 F.Supp. at 884

---

[10]Amtrak later recycles this entire argument in light of In re City of New York, 475 F.Supp.2d 235 (E.D.N.Y. 2007). Amtrak's Mem. 21-22. Amtrak's reliance on this case is mistaken. In In re City of New York, the operator of the Andrew Barberi Staten Island Ferry failed to comply with the City's two-pilot rule, which required two pilots to be present in the pilothouse at all times while the Ferry was underway. The court found that while the two-pilot rule was written, it was "neither well understood nor effectively enforced." 475 F.Supp.2d at 238. In contrast, Sea Wolf Marine did not establish written protocol regarding weather conditions, visibility, or adherence to the lookout rule. But as discussed above, Captain Sprague understood how to proceed regarding each of these matters.
    In the context of In re City of New York, Amtrak further argues that Sea Wolf Marine haphazardly disseminated its other safety rules and regulations. Amtrak's Mem. 21. Specifically, Amtrak criticizes Sea Wolf Marine's distribution, content, updating, and lack of compliance mechanisms for the vessel policy manual and employee safety manual. Id. at 5-8. Despite this broad argument, Amtrak fails to set forth specific facts that these alleged deficiencies in any way contributed to or caused the collision. Therefore, the Court need not address Sea Wolf Marine's knowledge or privity of the allegedly haphazard dissemination of its other safety rules and regulations.

(citations omitted); see Complaint of B.F.T. No. Two Corp., 433 F.Supp. 854, 874 (E.D.Pa. 1977)(disagreeing with Tug Ocean Queen). Because Captain Sprague was a competent operator, his decision not to post a lookout does not fall within Sea Wolf Marine's knowledge or privity.

Third, Amtrak asserts that Sea Wolf Marine failed to ensure that Captain Sprague "undertake the voyage with the utmost of care." Amtrak's Mem. 19-20. Under this broad claim, Amtrak asserts that (1) Sea Wolf Marine failed to require that Captain Sprague undergo remedial training, (2) Captain Wittich failed to discuss with Captain Sprague the prevailing weather conditions, (3) Sea Wolf Marine failed to mandate that Captain Sprague post a lookout as the Tug and Barge approached the Bridge, and (4) Captain Wittich failed to "discuss with Captain Sprague the reasonable alternative of aborting the voyage if weather conditions worsened." Id. None of these arguments are meritorious.

First, Sea Wolf Marine was under no obligation to require remedial training for Captain Sprague. Prior to the 2003 collision, Captain Sprague experienced only two accidents in approximately twenty-five years of service. Sprague Dep. 102-06. Because "even competent pilots occasionally experience groundings and [collisions]," remedial training was not required. Illinois Constructors Corp., 715 F.Supp. at 886. Second, Captain Wittich

12

was not required to discuss with Captain Sprague the prevailing weather conditions. It is undisputed that neither Captain Sprague nor any of the Tug's other crew members voiced any concern to Captain Wittich regarding the weather conditions on the night of February 6, 2003. Sea Wolf Marine's 56.1 Stmt. ¶ 48. Furthermore, both Captain Wittich and Captain Sprague understood that, after consultation with Captain Wittich, final authority to refuse a tow or cancel a tow that was already underway rested with Captain Sprague. Wittich Dep. 54-55; Sprague Dep. 22-23, 93. Third, it is undisputed that to complete its assignment, the Tug did not have to navigate under the Bridge or on the Spuyten Duyvil Creek. Sea Wolf Marine's 56.1 Stmt. ¶¶ 68-69. Captain Wittich did not know that the Tug and Barge would approach the Bridge. Even if Captain Wittich had known this fact, the failure to explicitly require that Captain Sprague follow the lookout rule does not constitute knowledge or privity of Captain Sprague's failure to follow that rule. <u>MO Barge Lines</u>, 360 F.3d at 891. Fourth, Captain Sprague was well aware that he had the "final authority" to "stall or stop a job because of deteriorating weather." Sprague Dep. 93. Amtrak fails in its third attempt to present a genuine issue for trial regarding Sea Wolf Marine's knowledge or privity.

Fourth, Amtrak asserts that Sea Wolf Marine failed to "insure that its directives [we]re being followed by making

13

inspections and inquiry." Amtrak's Mem. 20 (quoting <u>In re Seiriki Kisen Kaisha & Dragon Navigation, S.A.</u>, 1986 U.S. Dist. LEXIS 29169, at *35 (S.D.N.Y. Feb. 19, 1986)). Amtrak, however, fails to offer any evidence that Sea Wolf Marine did not follow up on its directives. <u>Id.</u> at 21.

None of Amtrak's arguments regarding knowledge or privity presents a genuine issue for trial. Sea Wolf Marine establishes that Captain Sprague's negligence does not fall within its knowledge or privity.

### III. Conclusion

Accordingly, the Court grants Sea Wolf Marine's motion for partial summary judgment [docket no. 46]. Any necessary factual and expert discovery on the issue of Amtrak's alleged damages shall be completed by December 7, 2007.

SO ORDERED.

Dated: New York, New York
November 6, 2007

_____
Kimba M. Wood
United States District Judge

14